Filed 12/22/21  P. v. Jeronimo CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>JESUS JERONIMO,<br><br>        Defendant and Appellant. | F078575<br><br>(Tulare Super. Ct. No. VCF333853A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Joseph A. Kalashian, Judge.  (Retired Judge of the Tulare Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

In an amended information filed September 27, 2016, the Tulare County District Attorney charged defendant with murder (Pen. Code, § 187, subd. (a)),[1] committed during a kidnapping (§ 190.2, subd. (a)(17)), and while lying in wait (§ 190.2, subd. (a)(15)). The information further alleged defendant personally used a firearm causing great bodily injury and death to the victim. (§ 12022.53, subd. (d).)

Defendant was jointly tried alongside codefendants Angelita Reyes and Arturo Hernandez Pompa (Arturo). The jury convicted defendant of murder and found the various allegations of the information to be true.[2] The court sentenced defendant to life in prison without the possibility of parole, plus a consecutive term of 25 years to life for the firearm enhancement. (§ 12022.53, subd. (d).)

Defendant makes several claims of prejudicial error. We order defendant's parole revocation fine stricken but otherwise affirm the judgment.

**FACTS**

Victim Abrahan Gaspar lived with his mother, Tomasa Reyes and her husband, Melesio Ramirez, in Hanford. Gaspar became the youth pastor at Tomasa's church in 2008, and later worked as an assistant pastor in 2012. Gaspar's job duty was to preach on Sundays.

Gaspar began dating codefendant Angelita Reyes. During their relationship, Angelita[3] and her two sons would sometimes sleep in Gaspar's room. According to Tomasa, Gaspar "couldn't preach any more" once he began dating Angelita, because "he felt bad about preaching." Later, Tomasa testified that, in fact, the head pastor prohibited Gaspar from preaching due to his relationship with Angelita.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] Angelita was convicted of first degree murder. The jury acquitted Arturo.

[3] Because multiple individuals involved in this case share the last name Reyes, we will refer to Angelita by her first name.

While Gaspar was dating Angelita, he was going through divorce proceedings with his wife in Mexico. According to Tomasa, Angelita would become angry with Gaspar because he would send money to his daughter in Mexico. Tomasa believed Angelita was jealous that Gaspar still had contact with his estranged wife and their daughter.

After an incident in December 2015, described more fully below, Gaspar and Angelita stopped seeing each other. Angelita told Tomasa that if she cannot have the person she loves, then "no one will." Angelita denied making this statement.

After church on Sunday, April 3, 2016, Gaspar told Tomasa he would be "right back" because he needed to change the tire on his truck. That was the last time Tomasa saw Gaspar.

The next day, Tomasa called Angelita and asked if Gaspar was with her. Angelita said she had spoken with Gaspar the day prior, but he was no longer with her.

On April 5, 2016, Gaspar's body was found in an almond orchard in an isolated part of Tulare County. There was little sign of struggle and jewelry had not been taken off the body. Gaspar had sustained injuries consistent with a gunshot wound to the head. There was no evidence Gaspar had been moved after falling to the ground. Based on fly larvae and decomposition level, a detective determined Gaspar's body had been in the orchard for between 36 and 48 hours.

A .44-caliber Magnum casing was found less than 10 feet from Gaspar's right foot. Two .25-caliber shell casings were found on a roadway east of the body.

The way Gaspar's shirt was pulled up and the location of the .44-caliber casing indicated the shooter was holding Gaspar's shirt, stepped off to the right side and shot Gaspar through his right temple.

Gaspar's vehicle was found about two miles from the crime scene.

3.

*Interview of Angelita*

On April 7, sheriff's detectives Chris Gezzer and Hector Rodriguez contacted defendant and Angelita. Detective Rodriguez told Angelita that Gaspar was dead. Angelita said someone else had already informed her of Gaspar's death. Angelita was not hysterical or in shock. Indeed, both defendant and Angelita seemed calm.

Angelita said Gaspar was her ex-boyfriend and that they had broken off their relationship roughly six months prior. Angelita said they broke up because Gaspar was a jealous person, and his family did not "accept" her. Angelita told Detective Rodriguez she had no problem with Gaspar sending money for his child, but she objected to him sending money to his wife.

Angelita said she and Gaspar had planned to get married. Angelita said she and Gaspar remained on friendly terms after the breakup and continued to communicate with one another.

Angelita told Detective Rodriguez that Gaspar had been blackmailing her with explicit videos or photographs that he threatened to send to family members and upload to social media. Angelita said someone from church told her that Gaspar had done something similar with a prior girlfriend named Mary. Angelita said defendant was aware of the photographs Gaspar allegedly had of her.

Initially, Angelita denied having seen Gaspar on the prior Sunday. Later, Angelita said Sunday, April 3, was the last time she spoke with Gaspar. She said the last place she saw him was in Delano. Later, Reyes changed the location she last saw Gaspar to Earlimart. She said defendant was with her when she met saw Gaspar in Earlimart. Reyes claimed she and defendant were roommates and denied that they were "partners."

Angelita later explained that she had asked Gaspar to meet her. When she told him that she needed to get gas, Gaspar said he would meet her in Earlimart. They met near a gas station in Earlimart. The gas station was "in the same area" where Gaspar's body would later be found.

4.

According to Angelita, Gaspar was supposed to return an engagement ring to her. However, when Gaspar saw defendant had accompanied Angelita, he became upset. They argued and Angelita eventually left. Angelita claimed that was the last she heard from or saw Gaspar.

After initially denying any knowledge of Gaspar's death, she eventually admitted that defendant had killed Gaspar. She said defendant had been angry with Gaspar, wanted to kill him, and had been looking for someone to loan him a gun. She also admitted that she was, in fact, dating defendant.

Later still, Angelita changed her story by saying that a man named Arturo was the one who wanted Gaspar dead. She now claimed that she went to the gas station alone, while Arturo and defendant arrived later. Defendant hid so he could not be seen. Angelita and Gaspar argued by the side of the road. During their argument, defendant emerged from his hiding spot, hit Gaspar five or six times in the face, and sprayed him with pepper spray. Angelita initially claimed she left after defendant's assault.

However, she later said that defendant forced Gaspar into her pickup truck at gunpoint. She also got into the pickup truck because she was scared of defendant's threats. Then they drove to an almond orchard. Defendant forced Gaspar out of the vehicle, while Angelita remained behind in the vehicle. Defendant took Gaspar a few rows into the orchard. Angelita moved into the driver's seat of the truck. She heard Gaspar ask if defendant was going to kill him. She also heard Gaspar tell defendant, "God loves you."

Angelita heard a gunshot, followed by defendant returning to the vehicle alone. They drove to return the gun to Arturo in Earlimart. Defendant admitted to Angelita that he had killed Gaspar.

Angelita never offered an explanation as to why her story kept changing.

Angelita spoke about the December 2015 incident. Angelita said she and defendant went to Gaspar's parents' house to make them aware of the images on his tablet. Defendant waited in the car outside.

*Interview of Defendant*

Detective Merced Zamora interviewed defendant. Defendant said he and Angelita were roommates.

Defendant also spoke about the incident where he and Angelita went to Gaspar's parents' house. Defendant and Angelita concocted a ruse to get Gaspar away from the house so they could retrieve the cell phone and tablet that allegedly had "sex videos." After retrieving the devices, defendant reset them to "factory mode," deleting their contents. As for the weekend of Gaspar's death, defendant claimed that a man approached Angelita in Earlimart and spoke with her. When the man realized defendant was there, the man left.

Defendant later "expanded" on his version of events. Defendant said Angelita told him Gaspar had "sex videos" of her. Gaspar had threatened that if Angelita ended their relationship, he would send the videos to her ex-husband and children, and he would post them to social media. Defendant said the situation made him feel "miserable" and that he wanted to do something about it. Defendant and Angelita "fabricated" a "lie" that Angelita was alone and that her truck was overheating necessitating that she park near Avenue 56. In order to "set up" Gaspar, defendant told Angelita to tell Gaspar that her vehicle was overheating.

Defendant hid in a vineyard across the street and placed a call to his friend Arturo to obtain a gun. Defendant had to be very insistent with Arturo to obtain the gun. Arturo arrived in his truck. Arturo tried to convince defendant he did not need a gun. Ultimately, Arturo gave defendant a gun,[4] but told him not to use it to kill Gaspar.

[4] Later, Detective Zamora indicated defendant said he himself retrieved the gun from the utility bed of Arturo's truck.

6.

Defendant ejected the magazine, saw it was loaded, and racked a round into the chamber of the gun.

When Gaspar arrived, defendant ran across the street, punched Gaspar in the body and head, and sprayed him with pepper spray (also accidentally spraying Angelita in the process). Defendant then pushed Gaspar into the truck, threatening to pepper spray him again. Angelita also entered the truck, and they drove to an almond orchard.

Defendant told Gaspar to exit the truck, and he complied. Gaspar asked if defendant was going to kill him. Defendant said, "I need you to walk." Gaspar asked defendant what he was going to do, and defendant replied, "I'm not sure." They walked five to seven rows into the orchard, as defendant pointed a handgun at Gaspar's right temple. Gaspar told defendant, "God forgives you for what you're going to do. This is not your doing. This is the devil's work."

In his own mind, defendant was telling himself, "Don't do it; if you do it[,] you'll get in trouble." However, defendant "also had voices that were telling him to do it because of all the agony that the victim was making Mrs. Reyes go through." With the gun "resting" on Gaspar's temple, defendant pulled the trigger and saw Gaspar "go backwards."[5] Defendant did not want to see Gaspar hit the ground, to avoid having nightmares.

Defendant returned to the truck and Angelita asked, "What did you do?" Defendant said, "Don't worry about it."

Defendant initially told detectives he dropped the gun "in the area." He later said he took the gun to Earlimart and put the gun "in the same pickup [truck] that … had dropped it off earlier."

---

[5] Defendant was given the choice to speak with Detective Zamora in English or Spanish. Defendant mostly spoke in English but used a few Spanish words. In describing the shooting, defendant used the Spanish word "derevato." Detective Zamora testified the word can be used to mean "spur of the moment" or, alternatively, to mean "a mess."

Defendant told Angelita that "sooner or later he was gonna kill" Gaspar but did not want to do anything in front of his family. Later, "the opportunity presented itself when they set him up on Avenue 56."

*First Interview of Arturo Hernandez*

On April 9, 2016, Detective Miguel Franco contacted Arturo Hernandez at his residence, and subsequently interviewed him in Franco's unmarked vehicle.

Arturo said he knew defendant and Angelita as coworkers. Angelita told Arturo she was being blackmailed. Angelita showed him the materials she was being blackmailed with, including explicit photographs of her and Gaspar having intercourse. Arturo wondered why Angelita would show him the photographs if she was afraid of people seeing them. Arturo told her to go to the police.

While Arturo initially admitted speaking with defendant and Angelita on Sunday, April 3, he did not mention anything about the crime scene on Avenue 56. Detective Franco then confronted Arturo with information that had been provided by "the other defendant."[6] At that point, Arturo changed his story. Arturo admitted delivering a gun to defendant and Angelita. Arturo said Angelita was parked on the southside of Avenue 56, and it appeared her vehicle had broken down. Arturo asked if Angelita was okay, and she said, "[Y]es." Another vehicle pulled up and asked Angelita if she needed help, to which she responded, "[N]o."

Arturo told defendant only to scare "him," and not to kill "him." Arturo delivered the gun and left the area.

Defendant and Angelita returned the gun to Arturo later that day. Defendant told Arturo he had taken "his" life.

---

**6** It is not clear whether this testimony means Franco confronted Arturo with information provided by defendant or by codefendant Angelita.

Arturo voluntarily provided the gun to Detective Franco. Franco observed the gun appeared to have bloodstains on it.

*Second Interview of Arturo Hernandez*

On May 23, 2016, Detective Hector Rodriguez took another statement from Arturo. Arturo said he, defendant and Angelita were together Saturday night and had a conversation about Gaspar.[7] They discussed "getting the victim to a location Saturday night." However, Gaspar texted or called later that night cancelling his trip to Bakersfield.[8]

Defendant called Arturo and said that Gaspar was coming to Bakersfield. Defendant asked Arturo to bring a gun so he could scare Gaspar. Defendant told Arturo where to meet up with him and Angelita. It was the same location where Gaspar's vehicle was later found.

Arturo usually kept three or four rounds in his magazine. However, before leaving to bring the gun and its magazine to defendant, Arturo loaded the magazine to full capacity with eight rounds.

Defendant told Arturo where to meet up with him and Angelita. Arturo went to that location and saw Angelita there next to her pickup truck, which had its hood up. Arturo did not see defendant. Angelita said defendant was near a reservoir across the street. He went to that area and located defendant. Defendant retrieved the gun from a toolbox in the truck Arturo was driving. The magazine was loaded into the gun, but there was no round in the chamber. Defendant asked how to operate the gun, so Arturo

---

[7] Arturo said that within the two weeks prior to this Saturday conversation, defendant had said he wanted to scare Gaspar. At some point within those two weeks, defendant also sent Arturo a message saying he wanted to kill Gaspar.

[8] Arturo claimed he suggested to defendant and Angelita that they go to the police. Arturo said something similar to Angelita's blackmail situation had happened to him, and the police resolved it.

9.

showed him where the safety was and how to load a round into the chamber. At some point, Angelita saw the gun and said it was "nice" and "big." Arturo left.

Later that day, defendant and Angelita returned the gun. Defendant said he had killed Gaspar. The gun had seven rounds in it.

Detective Rodriguez asked Arturo why he had brought the gun to defendant, but Arturo "had no real answer to that" other than his belief defendant was only going to scare Gaspar. Arturo said he was not forced or coerced into giving the gun to defendant.

*Text Messages*

On March 11, 2016, defendant sent a text message to Arturo in Spanish. Detective Zamora translated[9] the message as follows: "I can't sleep at ease. It's 2:30 and I went to bed at 11:45, dad. I do not know what to do with the thoughts of him arriving without giving notice and for them to sleep together or for him not to bring the video. It's killing me slowly from the inside watching how she fakes and pretends to talk to him like if he was the love of her life."

On April 1, 2016, defendant sent a text message to Arturo saying, "Do you think you could get a gun? I want it to be me who breaks that bastard son of a bitch." Defendant sent a follow up message, saying, "I am tired of him making my life, oh, my f[**]king life miserable." Arturo replied with a slang word for "yes."

Defendant sent another message, reading: "We are off tomorrow and Saturday. It will give me enough time to find that son of a bitch and end him. I am reaching the point where my heart is being filled with hate and poison. I can't carry this weight anymore."[10]

Detective Zamora did not find any "sex tape" on Gaspar's phone.

---

[9] Detective Zamora testified he is "certified with the county as a Spanish translator."

[10] The trial court overruled an objection that this was improperly translated.

*Trial Testimony of Javier Garcia*

Angelita's estranged husband, Javier Garcia, testified at trial. Garcia and Angelita had separated three or four years prior to his testimony (which was being given on July 18, 2018).

A man called Garcia on the phone and said he was going to send photographs proving the caller and Angelita had "been together." Garcia did not know who the man was. Garcia "cut him off" and said he was not interested because he and Angelita had been separated for over a year at that time.

*Trial Testimony of Angelita Reyes*

Angelita Reyes testified in her defense. Angelita worked as a "crew leader" and was in charge of hiring people. That is how she met Gaspar.

Angelita and Gaspar were dating by December 2014. Gaspar proposed marriage and gave Angelita an engagement ring in January 2015. However, they had broken up by the time Angelita met defendant months later, in March or April of 2015. Angelita said she and Gaspar broke up because his wife called him "a lot" and was asking for money. Angelita later added that Gaspar was jealous and possessive. However, Angelita considered getting back with Gaspar up until the time he was killed.

Gaspar sent explicit pictures and/or videos to Angelita's phone. Angelita asked why Gaspar had recorded her. Gaspar said he wanted something to remember her by. Sometime before December 2015, Angelita told the pastors at Gaspar's church about what he had done. A pastor's wife told Angelita she "wasn't the first person he had done that to." The pastor's wife told Angelita to "do whatever was necessary" to retrieve the tablet.

Angelita went to Gaspar's parents' house, retrieved the tablet, and showed Gaspar's father the video. Gaspar's father said that what Gaspar was doing was "not right." Gaspar's father said he would talk with Gaspar. However, Gaspar's father did not

11.

want Angelita to take the tablet with its "chip" inside. Angelita ran away with the tablet and got into a car being driven by defendant.

Even after this incident, Gaspar told Angelita he still wanted to marry her. Angelita told Gaspar she no longer trusted him. Gaspar also still had a video of Angelita on his phone. Gaspar said if she did not come back to him, he would show pictures to her husband and ruin her life. Eventually, Angelita told Gaspar she would get back with him in order to get the video.

Arturo told Angelita that defendant was very upset because of the videos and wanted to "beat up" Gaspar. According to Angelita, Gaspar had also been contacting defendant's female family members through social media. Angelita told defendant not to get involved and to leave it in God's hands.

Angelita and Gaspar agreed to meet on April 3, 2016, so Gaspar could give her the video and the engagement ring. Angelita agreed to meet Gaspar in Delano, though the location was later changed to Earlimart. Afterward, Angelita went with defendant to Earlimart.

In Earlimart, defendant told her the car was overheating. Defendant opened the hood and left it open. Defendant then went to a nearby vineyard for shade. About five or 10 minutes later, Gaspar arrived. He gave Angelita a hug and a kiss, then inspected the truck. He said it was "hot" and that they would just wait a while before leaving. As Gaspar and Angelita were talking, defendant ran up, hit Gaspar in the head, and sprayed them with "tear gas."

Defendant told Angelita and Gaspar to get into the truck and be quiet. He drove for a short while before stopping. He opened the door and told Gaspar to get out. Angelita asked, "What are you going to do?" Defendant removed Gaspar from the truck and left her locked inside. Angelita stayed inside the truck and does not know what happened next.

12.

Defendant returned to the truck and told Angelita to drive. Defendant told Angelita he had killed Gaspar. Angelita did not believe him. The next day Angelita called Gaspar's phone, not believing he had been killed.

Angelita initially gave a different story to law enforcement because she was concerned for the safety of her children.

*Trial Testimony of Arturo Hernandez*

Arturo testified that he worked as a supervisor of agricultural workers. Angelita was the crew chief for one of the teams Arturo supervised. Defendant worked on Angelita's crew.

Arturo and defendant developed a father-son type of relationship where defendant would tell him personal problems and Arturo would offer advice.[11]

Before Gaspar's death, Arturo and Angelita met at a fast food restaurant in Bakersfield. Angelita showed Arturo photographs of her having sex. Angelita said Gaspar would send the photographs to her late at night to cause problems between her and defendant. However, Angelita did not say Gaspar was blackmailing her. Arturo suggested Angelita and defendant contact the police.

Defendant asked if Arturo knew anyone who could sell him a gun. Defendant said he wanted to scare Gaspar so that he would "stop with the video and stop bothering" Angelita. Arturo denied that defendant ever told him he wanted to kill anyone. Nor did Arturo remember receiving any message from defendant saying he wanted to kill someone.

Defendant asked Arturo if he would loan him a gun to scare Gaspar and take the video from him. Angelita messaged Arturo asking where he was going. Arturo lied and said he had been arrested because he did not want to go to Bakersfield to give them the gun. Eventually, however, Arturo told Angelita he would go.

---

[11] At the time of trial, defendant was 24 years old, and Arturo was 39 years old.

Usually, Arturo's magazine had three or four bullets inside. However, Arturo loaded an additional four or five bullets into the magazine, for a total of eight bullets. When asked at trial why he loaded more bullets into the magazine, Arturo testified: "I've asked myself that question, like, a thousand times. And I've never been able to answer that question myself."

Arturo brought the gun and magazine and met defendant at a gas station in Bakersfield. Defendant brought Arturo back to the residence he shared with Angelita. Arturo put the gun and a separate magazine into a bag on a table in the residence.

Arturo slept at defendant/Angelita's residence that night. The next morning, a Sunday, Arturo brought the gun home. Later that day, around 3:00 p.m., defendant called Arturo asking if he could borrow the gun. Again, defendant said he just wanted to scare Gaspar with it. Arturo drove to where defendant had told him to meet – past the railroad tracks off of Avenue 56. Arturo had the gun and magazine in a toolbox in his truck. The magazine had eight bullets inside. As he was driving, Arturo saw Angelita's truck, with its hood up.

Arturo parked in front of the truck. He saw Angelita by the truck and defendant near some grapevines. Defendant asked if Arturo had brought the gun so he could scare Gaspar. Defendant retrieved the gun from Arturo's truck. Defendant asked Arturo how to chamber a round in the gun. Arturo told him that if he "brought the slide back, that would chamber a round." Arturo also told defendant that the "little lever" was the safety.

Arturo left before Gaspar arrived. About 40 minutes later, defendant called to return the gun. Defendant told Arturo he had killed Gaspar.

14.

## DISCUSSION

### I. Defendant Forfeited his Contention that Testimony Concerning a 911 Call Should Have Been Admitted; Ineffective Assistance Cannot be Established on Present Record

#### A. *Background*

In February 2017, Arturo's counsel moved for a continuance of trial. Defendant's counsel joined the motion for a continuance. Defendant's counsel said he spoke with defendant "yesterday." Defendant "provided" counsel "with information that [counsel] believes constitutes a separate ground for opening a new investigation" that would not be completed by the beginning of trial. The court then held an in camera hearing with defendant's counsel. We will limit our description of that in camera hearing to that which defendant reveals in his appellate briefing: a continuance was sought in order "to investigate whether [defendant] had reported Gaspar's harassment of Reyes to police."

At a pretrial hearing on July 10, 2018, the prosecutor noted that Angelita's counsel had provided a witness list with four names, including Officer James King of the Bakersfield Police Department. The prosecutor explained that Angelita and defendant had "made a call to 911" but "never … followed through with making [a] report." Angelita's counsel described the call as follows: "She's [presumably Angelita] saying the guy [presumably Gaspar] is stalking her, guy is pursuing her, and he's blackmailing her, and so she's saying it's fresh at the time."[12]

The prosecutor argued, "It is not an emergency – she's not being stalked that day. She's just finally deciding to want to report something." As a result, the prosecutor argued the call was "hearsay without an exception." Angelita's counsel responded, "I think he was pursuing her that day. She had gotten this tablet and this phone had some of these things and she got that out of this room, and that's when she first saw it, and he was pursuing her, and his father was trying to chase her in the car." The prosecutor observed

---

[12] Contextually, these mentions of a "guy" are clearly references to Gaspar.

15.

that "nowhere in the 911 call does it say that" the confrontation regarding Gaspar's electronics occurred on the day of the 911 call.

The court clarified to Angelita's counsel, "You wanted to introduce your client's statement?" Angelita's counsel responded affirmatively. The court said the 911 call statements were "clearly" hearsay. The court ultimately ruled that it would not "allow" the 911 call.

No recording or transcript of the 911 call are found in the record. However, defendant argues that Angelita's counsel's offer of proof, described above, "was sufficient to establish the admissibility of this evidence."

Defendant never attempted to move the 911 call into evidence. (See *People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1302–1304.)

### B. *Forfeiture*

Defendant argues statements he and Angelita made on the 911 call were admissible as spontaneous statements (Evid. Code, § 1240) or statements bearing on the declarant's state of mind (*id*., § 1250). However, a defendant may not assert on appeal grounds for admissibility of evidence that he did not advance in the trial court. (See *People v. Jones* (2017) 3 Cal.5th 583, 603.) While there was an offer of proof as to the substance of the 911 call, defendant did not assert the specific grounds for admissibility he advances on appeal (i.e., spontaneous statement, state of mind)

In contrast, Angelita's counsel did argue the 911 call statements were "fresh" and therefore admissible. Defendant argues the issue is preserved for appeal because "the parties" discussed how Officer King's anticipated testimony would be admissible, and "the defense" made the substance, purpose and relevance of the evidence known to the court. However, even if Angelita's counsel's argument in the trial court preserved the issue on behalf of his own client – an issue we do not resolve here – it would not preserve the issue on behalf of codefendants such as appellant. (See *People v. Santos* (1994) 30 Cal.App.4th 169, 180, fn. 8, disapproved on other grounds by *People v. Dalton* (2019) 7

16.

Cal.5th 166, 214; see also *People v. Miranda* (1987) 44 Cal.3d 57, 77–78, overruled on other grounds by *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4.)

Defendant also points out his counsel obtained a trial continuance to "investigate" the evidence he reported Gaspar to the authorities. But the issue of whether to continue the trial to permit a defense investigation of certain evidence is a different issue than whether said evidence is admissible and on what grounds. Requesting a continuance to investigate an evidentiary issue does not preserve issues relating to the eventual admissibility of the investigated evidence.

### C.     *Defendant Cannot Establish Ineffective Assistance of Counsel on Direct Appeal*

Defendant argues that if this issue is forfeited, then counsel was constitutionally ineffective.

"A criminal defendant's federal and state constitutional rights to counsel (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15) include the right to *effective* legal assistance. When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.

All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding. [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

When a defendant's claim of ineffective assistance of counsel requires investigation of evidence outside the record, it can only be addressed in a habeas corpus proceeding. (See *People v. Williams* (2013) 56 Cal.4th 630, 691.) Here, defendant's claim of ineffective assistance requires investigation of evidence outside the record: the 911 call itself. While the record contains a broad description of the topic of the 911 call, there is no transcript or recording. Such evidence is necessary to determine whether there *could* be *any* satisfactory tactical explanation for defense counsel's failure to seek its admission. It remains entirely possible that the 911 call included some statements that were helpful to the defense, while also including some statements detrimental to the defense. And under Evidence Code section 356, admission of the favorable statements made on the 911 call might have necessitated admission of any other, unfavorable statements. If that were the case, counsel could have made a reasonable tactical decision not to seek admission of the favorable statements made on the 911 call to avoid admission of unfavorable statements. Because the present record permits a conceivable tactical basis for counsel's alleged failure to act, reversal on direct appeal is not permitted.

> **D.** ***Prosecutor's Improper Comments During Closing Argument Did Not Require Mistrial nor do They Warrant Reversal on Appeal***

### 1. Background

During her opening statement, the prosecutor said:

> "Vigilante justice is not allowed in this country. You all swore to follow the law. And the law says you're supposed to go to the police when you have a problem. You don't get to take the law into your own hands, even if what they claim is true."

After the presentation of evidence and before counsels' closing arguments, the court gave various jury instructions, including the following:

18.

"Nothing the attorneys say is evidence. In their opening statements and closing arguments the attorneys discuss the case, but their remarks are not evidence…."

During closing argument, the prosecutor said:

"[Defendant and Angelita] didn't go to the police.  They didn't use the justice system.  They took the law into their own hands and that, two, they had the intent to kill because, like I just said, their other ways didn't work.  But they didn't use legal means any which way that they did this case [*sic*]."

The court and counsel then held an unreported sidebar.  Afterwards, the prosecutor then continued with her argument.  Near the conclusion of her argument, the prosecutor said:

"Look, we live in America.  This is not the old Wild West.  You don't get to take the law into your own hands.  You don't get to scare someone with a gun over a sex tape.  You don't get to kill someone for allegedly blackmailing you or someone you care about.

"You're required to go to the authorities and let the criminal justice system do what it's designed to do.  This is what separates our country from the rest of the world.  We do not allow vigilante justice.

"You agreed to follow the law when you all swore in to be jurors. The law does not recognize vigilante justice."

After the prosecutor finished her closing argument, a discussion occurred outside the presence of the jury.  Angelita's counsel argued it was improper for the prosecutor to say that Angelita had not gone to the cops, and that the matter "should have been taken to the police."  Angelita's counsel pointed out that the prosecutor knew "from the beginning" of her involvement with the case that "this" was reported to the Bakersfield Police.  Thus, the prosecutor had "put in front of a jury [something] she knows was not true."

Defendant's counsel joined in the objection to the prosecutor's argument.  He argued that records obtained from the police department pursuant to a subpoena issued

19.

March 28, 2017, "specifically indicate[d] that Angelita Reyes did contact the Bakersfield Police Department about this issue, about an issue relating to extortion."

The prosecutor argued: "I was very specific in my closing argument. I did not state that they called 911 [*sic*]. I stated they did not make a report. Calling 911 is not making a report."[13]

The court observed that the prosecutor had actually said, in essence, that they did not go to the police. The court said the prosecutor's argument was a "half-truth" and that she was "parsing words" between a report and a 911 call. The court said, "if it happens again in this Court, it will be the last time it happens in this Court."

The court said it would tell the jury "that there's no evidence one way or the other whether they went to the police or not." Angelita's counsel responded that that would be a half-truth as well since there is evidence that they went to the police. The court responded, "Well, there's no evidence before the Court." Angelita's counsel asked if the court could "tell the jury to delete it?" The court responded affirmatively.

Defendant's counsel then said he did not have any choice but to ask for a mistrial. The court denied the request for a mistrial, saying, "It hasn't reached that point."

When the jury was brought back in, the court said: "Okay, ladies and gentlemen, you're going to hear the next argument. Before I do that, there was a statement made by the prosecutor regarding that no contact was made with police following this incident by the defendants. You're to disregard that portion of the argument."

### 2. Analysis

" 'A prosecutor's conduct violates a defendant's constitutional rights when the behavior comprises a pattern of conduct so egregious that it infects " 'the trial with unfairness as to make the resulting conviction a denial of due process.' [Citation.]"

---

[13] The prosecutor also contended that the 911 call was "contrived" because they thought they were going to get caught for stealing from Gaspar's parents' house.

[Citation.] The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor. [Citation.] Conduct that does not render a trial fundamentally unfair is error *under state law only* when it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' [Citation.]" ' [Citation.]" (*People v. Hamilton* (2009) 45 Cal.4th 863, 920, italics added.)

For the reasons explained below, we conclude the prosecutor's improper statements were not " 'so egregious' " that they " 'infect[ed] " 'the trial with unfairness as to make the resulting conviction a denial of due process.' [Citation.]" ' " (*People v. Hamilton*, *supra*, 45 Cal.4th at p. 920.) As a result, they did not violate the federal constitution.

However, the prosecutor did convey inaccurate information to the jury in an attempt to persuade. As explained below, we conclude the prosecutor erred under state law, but that the error was not prejudicial.

We must begin with the fact that the prosecutor's statement that defendants "didn't go to the police" was plainly misleading. While the prosecutor had successfully argued pretrial that *evidence* of defendants' 911 call should be excluded, that ruling did not change the reality that defendants did in fact call 911 according to the undisputed offer of proof. Arguably, the prosecutor's statement that defendants did not "use the justice system" is misleading for the same reason. Regardless of the prosecutor's intent, her statements were an " ' " ' "attempt to persuade … the jury[]" ' " ' " in a " ' " ' "deceptive" ' " ' " manner. (*People v. Hamilton*, *supra*, 45 Cal.4th at p. 920.) Therefore, the prosecutor erred under state law and the trial court was correct to admonishing her.[14]

---

[14] It is important to note that many of the prosecutor's comments on this topic were not improper. That defendants did not go to the police is a specific falsehood that should not have been conveyed to the jury. But it was entirely permissible to argue more

21.

We must next evaluate prejudice. Because the prosecutor erred under state law, the question "is whether it is 'reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the comment attacked by the defendant. [Citations.]' [Citation.]" (See *People v. Bolton* (1979) 23 Cal.3d 208, 214.) We conclude it is not reasonably probable defendant would have obtained a more favorable result absent the prosecutorial error.

First, before the jurors heard the prosecutor's objectionable statements in closing argument, the court instructed them to decide the facts "based only on the evidence that was presented to you in this trial." The court further instructed the jury that *nothing* the attorneys say is evidence. The instructions then specifically identified closing argument as an example of "remarks" that are "not evidence." We presume jurors follow instructions. (*People v. Edwards* (2013) 57 Cal.4th 658, 746.)

Moreover, after the prosecutor made the objectionable remarks, the court told the jury to "disregard" the prosecutor's statement that "no contact was made with police following this incident by the defendants." Defendant argues that this phrasing was "vague" and that the jury could have interpreted "this incident" to be the shooting of Gaspar. In that case, "the jurors could have understood this admonition as requiring the jury to disregard any argument to the effect that the defendants didn't contact police after Gaspar was shot."

While the phrase "this incident" is somewhat vague, we doubt the jurors would have understood the instruction in the way suggested by defendant. Given the context of the prosecutor's statement, it seems far more likely the jury would have understood "this incident" to refer to the incident where, according to the prosecutor, Angelita "stole" Gaspar's "electronics" from his parents' house. In context, the prosecutor said:

---

broadly that defendant should not have killed Gaspar and, instead, should have allowed the justice system to handle any alleged extortion.

"Now, motive also goes to that theft that happened at the victim's parents' home when they stole those electronics.  You can use that evidence to show they had the movie to ultimately kill.

"But guess what?  According to them, stealing it wasn't enough. They didn't go to the police.  They didn't use the justice system.  They took the law into their own hands and that, two, they had the intent to kill because, like I just said, their other ways didn't work."

In any event, even if it could be argued that the court's after-the-fact instruction to "disregard" the prosecutor's statement was ineffective, it would not negate the impact of the court's broader instruction that closing arguments are not evidence.

Second, the evidence against defendant was quite overwhelming.  Defendant admitted shooting Gaspar.  According to defendant himself, he led Gaspar into an orchard, thought about the "agony" Gaspar was causing, and shot Gaspar in the head. Several witnesses said defendant told them afterward he had killed Gaspar.  This evidence would have been before the jury even if the prosecutor had not made the objectionable statements in closing argument.  In light of this evidence, we cannot conclude that the improper suggestion defendant did not call 911 about Gaspar's alleged extortion affected the outcome of the case.

In sum, because the prosecutor's remarks were not so egregious as to infect the trial with fundamental unfairness, defendant's federal due process rights were not violated.  And while the misleading argument to jurors was error under state law, it was not prejudicial.[15]

E.      ***Prosecutor's Comments Regarding Premeditation and Deliberation do not Require Reversal***

Defendant next claims the prosecutor prejudicially misstated the law of premeditation and deliberation during closing argument.

---

[15] "For the same reasons, [i.e., lack of incurable prejudice] we reject defendant's claim that the trial court erred by denying his motion for mistrial …."  (*People v. Montes* (2014) 58 Cal.4th 809, 888.)

### 1. Background

During closing argument, the prosecutor said:

> "So the test in this case is whether – it's the extent of the reflection, not the length of time. In other words, you took it – the moment you had this in your head, you made a decision.
>
> "Let's use baseball as an analogy again. When you're a batter at the plate – it doesn't matter if you're a left-handed or a right-handed batter – you're standing at 9 feet away of the pitcher. So you have the time it takes from that ball leaving that pitcher's hand to arriving somewhere in front of you, hopefully – if they're not trying to hit you or through a random shot – to decide do I swing; do I not swing?"
>
> That whole amount of time do I or don't I? Is it in the sweet spot I want? Is it going to go where I want? And, yet, all that happens in a couple of seconds. And that is a careful, deliberate, premeditated decision to swing the bat.

Defendant offered no objection to this argument.

### 2. Analysis

#### a. *Defendant Forfeited this Argument*

By failing to object to this aspect of the prosecutor's argument, defendant forfeited the issue for appeal. (See *People v. Williams* (2016) 1 Cal.5th 1166, 1188, citing *People v. Watkins* (2012) 55 Cal.4th 999, 1032.)

### F. *Defendant has Failed to Establish the Elements of a Claim of Ineffective Assistance of Counsel*

Defendant argues his counsel was ineffective for failing to object to the prosecutor's argument concerning premeditation and deliberation.

#### 1. Ineffective Assistance of Counsel

"The burden of proving a claim of inadequate trial assistance is on the appellant. [Citation.] He must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. Additionally, he must establish prejudice, i.e., a reasonable probability that absent counsel's unprofessional errors the

24.

result would have been different, before he can obtain relief. [Citations.] Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. [Citations.]" (*People v. Felix* (1994) 23 Cal.App.4th 1385, 1394.) "Failure to raise a meritless objection is not ineffective assistance of counsel. [Citation.]" (*People v. Bradley* (2012) 208 Cal.App.4th 64, 90.)

### 2. Premeditation and Deliberation

"First degree murder 'has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty.' [Citation.] These elements require 'more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death.' [Citation.] ' " 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly ….' " ' [Citation.]" (*People v. Gomez* (2018) 6 Cal.5th 243, 282.) " ' "Premeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection.' " ' " (*People v. Solomon* (2010) 49 Cal.4th 792, 812; see also *People v. Brito* (1991) 232 Cal.App.3d 316, 324.)

### 3. Analysis

Defendant argues the prosecutor "misstate[d] the law." Specifically, he contends the prosecutor incorrectly indicated that "premeditation and deliberation can be formed in [the] quarter of a second in which a batter makes the decision of whether to swing at a pitch in baseball…."

However, the prosecutor actually said that the decision of whether to swing happens within "a couple of seconds" (not a quarter of a second).[16] It is accurate that premeditation and deliberation can occur in a " ' "brief interval." ' " (*People v. Solomon*, *supra*, 49 Cal.4th at p. 812; see also *People v. Brito*, *supra*, 232 Cal.App.3d at p. 324; *People v. Jones* (1963) 215 Cal.App.2d 341, 346; *People v. Donnelly* (1922) 190 Cal. 57, 58–59.)

However, more importantly, the prosecutor made clear at the outset of the analogy that "the test in this case is … the extent of the reflection, *not the length of time*." Thus, the prosecutor's analogy, when considered in context, was not likely to be interpreted by the jury in a manner inconsistent with the law.

Moreover, there was little reason to believe that the jury's decision turned on the length of time required to formulate premeditation and deliberation. The evidence showed that earlier on the day of the shooting, defendant obtained a gun, and racked a round into its chamber. Defendant attacked the victim with pepper spray, had the victim brought to an orchard, exited the vehicle, and led the victim into the orchard. Defendant thought about "all the agony that the victim was making [Angelita] go through," pointed the gun at the victim's temple, and pulled the trigger. Even if the prosecutor had incorrectly led the jury to believe premeditation and deliberation could be formed in a "quarter of a second," there is little reason to believe that would have made a difference on the facts of this case.

---

[16] Defendant argues the prosecutor was factually incorrect on this point because, in the major leagues, the pitcher's mound is 60 feet, 6 inches from home plate. Thus, defendant argues that a major league batter facing a 90 mile per hour pitch only has a quarter of a second to make the decision of whether to swing.

First, defendant's claim relies on matters outside the record. Second, what matters here is the analogy the prosecutor actually made, because that is what the jury heard. The prosecutor's actual analogy involved a batter that has a "couple of seconds" to make a decision.

Defendant disagrees, pointing to his statement to police where he claimed he was having a conversation in his head while in the orchard with Gaspar. On the one hand, his mind was telling him "don't do it, if you do it you'll get in trouble." On the other hand, he also had internal voices telling him to "do it because of all the agony that the victim was making [Angelita] go through." This, defendant suggests, shows he "only made [the] decision" to shoot Gaspar "at the very last second." However, the fact that defendant considered *not* murdering Gaspar actually *supports* deliberation. " 'Deliberation' refers to careful weighing of considerations in forming a course of action; …" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) And under defendant's own version of events, he was weighing considerations (for and against) in forming a course of action.[17] His ultimate course of action, *after such deliberation*, was to pull the trigger.

For these reasons, we conclude defendant has failed to show a reasonable probability that, absent counsel's alleged error, the result would have been different.

### G.     *Evidence did not Support Sua Sponte Instruction on Heat of Passion*

Defendant next argues that the court erred in failing to instruct the jury, sua sponte, on the lesser included offense of voluntary manslaughter based on heat of passion. (See CALCRIM No. 570.)

" 'A trial court has a sua sponte duty to "instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser." [Citation.]' " (*People v. Chestra* (2017) 9 Cal.App.5th 1116, 1121.) Substantial evidence does not mean *any* evidence. (*Ibid.*) It must rise to the level of

---

[17] Cases like *People v. Boatman* (2013) 221 Cal.App.4th 1253, make clear that pulling back a gun's hammer, aiming and firing "without more" is insufficient to prove premeditation and deliberation. (*Id.* at p. 1274, fn. 4.) Here, however, there was more evidence, including defendant's procurement of a loaded gun and racking a round into the chamber *earlier in the day* of the shooting, and defendant's own statements about his deliberative process immediately before the shooting.

27.

evidence " ' " 'from which a jury composed of reasonable [persons] could … conclude[]' " that the lesser offense, but not the greater, was committed. [Citations.]' [Citation.]" (*Ibid.*)

"For heat of passion voluntary manslaughter to apply, the defendant must be under the actual influence of a strong passion that obscures reason at the time of the homicide. [Citations.]" (*People v. Chestra*, *supra*, 9 Cal.App.5th at pp. 1121–1122.) "Heat of passion … is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) A person who acts "without reflection" in response to adequate provocation does not act with malice. (*Ibid.*)

The evidence does not support heat of passion. By defendant's own account, he did not engage in "unconsidered reaction," nor did he act "without reflection." Instead, he reflected, considered, and weighed killing Gaspar. Internally, defendant considered the possibility of getting "in trouble." Yet, defendant "also had voices that were telling him to do it because of all the agony that the victim was making [Angelita] go through." Defendant then shot Gaspar in the head.

Defendant points out that several heat-of-passion cases involve romantic "dispute[s]" and that the present case also involves a romantic dispute. (See, e.g., *People v. Bridgehouse* (1956) 47 Cal.2d 406, abrogated on another point by *People v. Lasko* (2000) 23 Cal.4th 101, 110.) It is true that certain romantic disputes can rise to the level of adequate provocation. However, sufficient provocation is only one aspect of heat of passion. Even assuming that defendant was subjected to legally adequate provocation, the evidence must also show that his reason was " 'actually obscured' " at the time of the killing. (See *People v. Thomas* (2012) 53 Cal.4th 771, 813.) And, as explained above, the evidence showed that defendant did not *actually* act out of unconsidered reaction, without reflection. The evidence does not support the contrary inference.

28.

Therefore, we conclude the trial court was not required to instruct, sua sponte, on heat-of-passion manslaughter.

### H. *Trial Court did not Err in Refusing to Instruct Jury with CALCRIM No. 522*

Defendant next contends the court erred in refusing a defense request to instruct the jury with CALCRIM No. 522.

CALCRIM No. 522 provides:

> "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide.

> "If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.]

> "[Provocation does not apply to a prosecution under a theory of felony murder.]" (CALCRIM No. 522.)

This is a "pinpoint instruction to which a defendant is entitled only upon request *where the evidence supports the theory*. [Citation.]" (*People v. Rivera* (2019) 7 Cal.5th 306, 328, italics added.) For the reasons explained in our discussion above concerning heat-of-passion manslaughter, the evidence does not support this theory and the trial court was not required to give it.

### I. *No Cumulative Prejudice Has Been Shown*

Defendant argues the alleged errors discussed above were cumulatively prejudicial. However, the only error identified was the prosecutor's error in saying to the jury that defendants did not go to the police.

### J. *Defendant has not Established Trial Court was Unaware of its Discretion in Sentencing*

"Senate Bill No. 620 (2017–2018 Reg. Sess.) amended section 12022.53, subdivision (h) to give trial courts discretion to 'strike or dismiss' enhancements imposed

29.

under this section 'in the interest of justice pursuant to [s]ection 1385.' " (*People v. Tirado* (2019) 38 Cal.App.5th 637, 642, rev. granted Nov. 13, 2019, S257658.) Here, the trial court did not exercise this discretion to strike or dismiss the enhancement in this case, and sentenced defendant to a consecutive term of 25 years to life for the gun enhancement under section 12022.53, subdivision (d).

Defendant contends that, "even presuming the trial court was aware of its discretion to strike the firearm use enhancement under newly-enacted section 12022.53, subdivision (h) … the trial court would not have been aware that this discretion included the option of imposing sentence on a lesser included firearm use enhancement instead." But this court has squarely held that the trial court does not have this latter type of discretion to impose a lesser included enhancement.[18] (*People v. Tirado*, *supra*, 38 Cal.App.5th at pp. 641–644.) It is not error for the trial court to be "unaware" of discretion it does not have.

### K.    *Parole Revocation Fine Shall be Stricken*

Defendant argues the court erred in imposing a stayed parole revocation fine because he was sentenced to life without the possibility of parole. The Attorney General agrees the parole revocation fine should be stricken. We accept the concession. (See *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183–1186.)

### DISPOSITION

Defendant's parole revocation fine is stricken, and the trial court is directed to cause an amended abstract of judgment to be prepared and transmitted to appropriate parties and entities. In all other respects, the judgment is affirmed.

---

[18] Defendant notes the opposite conclusion was reached in *People v. Morrison* (2019) 34 Cal.App.5th 217 and urges us to follow that case. However, as this court stated in *Tirado*, "[w]e do not find the reasoning in *Morrison* persuasive and respectfully disagree with it." (*People v. Tirado*, *supra*, 38 Cal.App.5th at p. 644.)

POOCHIGIAN, ACTING P. J.

WE CONCUR:


SMITH, J.


SNAUFFER, J.

31.